**UNITED STATES, Appellee,**

v.

**Adolfo MAGANA, Defendant–Appellant.**

**UNITED STATES, Appellee,**

v.

**Ana Maria MEDA–SANTOS,
Defendant–Appellant.**

Nos. 96–2182, 96–2183.

United States Court of Appeals,
First Circuit.

Heard May 8, 1997.

Decided Sept. 16, 1997.

Thomas J. Connolly, by appointment of the court, for appellant Adolfo Magana.

Bruce M. Merrill, by appointment of the court, with whom Merrill & Merrill, P.A., was on brief, for appellant Ana María Meda–Santos.

F. Mark Terison, Assistant United States Attorney, with whom Jay P. McCloskey, United States Attorney, and Donald E. Clark, Assistant United States Attorney, were on brief, for appellee.

Before STAHL and LYNCH, Circuit Judges, and O'TOOLE,* District Judge.

O'TOOLE, District Judge.

Adolfo Magana was convicted by a jury of entering into a sham marriage to evade the immigration laws, in violation of 18 U.S.C. § 1325(b). His codefendant Ana María Meda–Santos was convicted of aiding and abetting Magana's crime. 18 U.S.C. § 2. Both defendants were also convicted of conspiracy to defraud the United States. 18 U.S.C. § 371.

They appeal from their convictions, asserting that the district court erred in the way it dealt with the government's violation of a witness sequestration order. The defendants criticize the district court's handling of the violation in three respects. First, both defendants contend that the court erred in denying their motions for a mistrial. In addition, Meda–Santos argues that the court abused its discretion in striking the redirect and Magana's recross-examination of the witness involved, thereby depriving her of the opportunity for any recross-examination of the witness. Finally, Meda–Santos objects to the district court's denial of her pretrial severance motion, and she points to the codefendants' disagreement as to how the court should respond to the sequestration violation

---

* Of the District of Massachusetts, sitting by designation.

as evidence of prejudice to her from the refusal to sever.

The defendants further contend that the court erred in denying them a pretrial opportunity for discovery concerning their allegations of selective prosecution and later in denying their motion for a new trial when events at trial added support to the allegations.

For the reasons that follow, we find no error and affirm the convictions.

## I.

Magana is a native and citizen of El Salvador who came to the United States seeking asylum. He was granted leave to remain in the country on a nonpermanent basis and to work while his application for asylum pended. Magana and Meda–Santos were friends who spent a substantial amount of time together. They both were employed by the same company in Portland, Maine, as were two other persons involved in relevant events, Tina Ferrante and Ronda Cunningham.

Magana's legal status in this country was only temporary, and if his application for asylum were to be rejected, he faced the prospect of losing his right to remain legally within the United States. In March 1995, his friend Meda–Santos approached her co-worker Ferrante, a citizen, to see if she would agree to marry Magana so he could become a permanent resident. Ferrante declined, but she suggested her friend Cunningham for the scheme. On July 14, 1995, Magana, Meda–Santos, Ferrante, and Cunningham all met at Magana's apartment and worked out the plan. Cunningham agreed to marry Magana in exchange for $2,000.

A week later, Magana and Cunningham were married by a justice of the peace at Magana's apartment in the presence of Meda–Santos and Ferrante. That evening Cunningham received a partial payment of the agreed price for her participation. There was evidence that despite their marriage, Magana and Cunningham did not live together as husband and wife.

In late August, Magana and Cunningham completed and submitted the forms required by the Immigration and Naturalization Service ("INS") for an adjustment of Magana's status to permit him permanent residence by reason of his marriage to a United States citizen. In accordance with INS practice, after the forms had been reviewed Magana and Cunningham were summoned to an interview at the local INS office. In separate interviews, they gave inconsistent information about their circumstances and living arrangements. Each appeared to know little personal information about the other. When Cunningham was confronted by the interviewer with the fact of the inconsistencies, she confessed her participation in the scheme. She was eventually given immunity in exchange for her cooperation with the prosecution, and she was a key witness at the trial of the defendants.[1]

Both defendants filed pretrial motions to sever their trials, which were denied by a magistrate judge for the reason that neither had shown any likely prejudice from a joint trial. The defendants also sought pretrial discovery from the government to support their claim that these defendants, Spanish-speaking non-citizens, were victims of selective prosecution because of their ethnicity and national origin. The district court refused to order the requested discovery.

At the commencement of the trial, counsel for Magana moved orally for the sequestration of witnesses. The court granted the motion, saying, "Yes, and I'll rely on all counsel to watch the courtroom to let me know whether there's anyone in who should not be present." Trial Transcript ("Tr.") at 3. Nothing further was said about any specific terms of the sequestration order.

The first trial day ended with the important government witness Cunningham on the stand. She had given extensive testimony on direct examination and had been cross-examined at length by counsel for both defen-

---

1. Ferrante also cooperated with the prosecution and was not charged, although it does not appear

dants.[2] The prosecutor indicated that he would have some redirect examination when the trial resumed the next day.

After redirect examination that lasted just over fifteen minutes, counsel for Magana conducted recross-examination, in the course of which the witness disclosed, in answer to a question, that she had talked to the prosecutor about her testimony during the overnight recess.

Defense counsel immediately protested that there had been a violation of the witness sequestration order, and they moved for a mistrial. The court denied the motions. Although the court found that the prosecutor had violated the sequestration order, it also concluded that there was no prejudice to the defendants from the violation. The court said, "[T]he redirect, although competent redirect, certainly, did not significantly impair whatever value there was in the cross-examination that took place yesterday." Tr. at 266. Moreover, the court found that the violation of the sequestration order had been unintentional, the result of a misunderstanding by the prosecutor of the scope of the order.

After denying the mistrial motions, the court extended to defense counsel the option of continuing the recross in front of the jury or of conducting a *voir dire*, outside the presence of the jury, to determine the discussions that had occurred between the witness and the prosecutor. The court said: "I certainly will permit cross-examination about the nature of the meeting this morning, what was said or suggested, and the only issue is whether you request to do that now before doing it in front of the jury, or whether you would rather do it once with the witness present in front of the jury." Tr. at 267. After conferring, counsel elected to conduct a *voir dire*.

In the *voir dire*, Cunningham testified that she had met for fifteen to twenty minutes that morning with the Assistant United States Attorney and an INS Special Agent. She testified that the prosecutor went over the questions he intended to ask her in the course of redirect examination, identifying the particular parts of the cross-examination that the questions were intended to address. She testified that she was not told how she should answer the questions that would be asked.

Counsel for both defendants asked that Cunningham's testimony that day be stricken. Tr. at 264. One of them summarized the testimony as indicating that "the U.S. Attorney's Office essentially did a practice run of the redirect examination today." Tr. at 285. Counsel argued that the rehearsal gave the prosecution an unfair advantage that it would have lacked if the sequestration order had been obeyed.

After a short recess to consider the matter, the district court confirmed its denial of the defense motions for a mistrial, and further said:

Counsel, I am considering striking the testimony for reasons I'll describe in a moment, but before I do that, I want to be sure that the defendants' lawyers fully appreciate and understand what they're doing on this score. I've denied the motion for mistrial. If I strike the testimony, Ms. Cunningham will not take the stand any further, she will be done as a witness.

That means that the cross-examination that took place this morning as well as the direct[3] will all come out, as well as the Defendant's Exhibit 9 that was admitted,[4] the Government's Exhibit 200, the cooperation agreement. That may be able to come in in some other fashion, and therefore, the defendants are choosing not to explore any further credibility issues or reliability issues concerning Ms. Cunningham.

I want to be sure that's being done carefully and intentionally because if I grant the motion to strike the testimony this morn-

---

that she was granted immunity.

**2.** The district court was moved to observe, twice, that the questioning had become repetitive. Tr. at 228, 261.

**3.** There is no doubt that the court meant "recross-examination" and "redirect."

**4.** Exhibit 9 was a receipt from INS for money paid to it by Cunningham.

ing, what I'll be instructing the jury to do is to consider only the testimony of Ms. Cunningham that was given yesterday on direct and cross.

Tr. at 288–89.

At this point defense counsel requested disparate relief. Counsel for Magana asked that the testimony be stricken; counsel for Meda–Santos, who unlike Magana's counsel had yet to ask any questions on recross, withdrew his motion to strike the testimony and insisted on the opportunity to conduct recross-examination.

The court struck the testimony, both redirect and recross, and instructed the jury that they should disregard it and consider only the testimony the witness had given the day before. Neither party objected to the instruction given to the jury.

The court also told counsel:

Now I'm cognizant of [Meda–Santos' counsel's] argument that there's certain things he would like to get out of this witness, possibly he will want to call her on his direct case, that's entirely up to [him].

Tr. at 291. Counsel for Meda–Santos asked that Cunningham be advised to remain "on call" for further testimony, but he did not later call Cunningham as a witness.

## II.

### A.

The sequestration of trial witnesses is a practice of long standing, and it may take various forms. "The judge's power to control the progress and, within the limits of the adversary system, the shape of the trial includes broad power to sequester witnesses before, during, and after their testimony." *Geders v. United States*, 425 U.S. 80, 87, 96 S.Ct. 1330, 1335, 47 L.Ed.2d 592 (1976). Until the adoption of the Federal Rules of Evidence, however, there was no positive rule governing the practice generally in the feder-

al courts, except that the matter was committed to the sound discretion of the trial court. *See Holder v. United States*, 150 U.S. 91, 92, 14 S.Ct. 10, 10–11, 37 L.Ed. 1010 (1893). Rule 615 now requires the court, upon a party's request, to "order witnesses excluded so that they cannot hear the testimony of other witnesses." Fed.R.Evid. 615. *See United States v. Sepulveda*, 15 F.3d 1161, 1175–76 (1st Cir.1993); *United States v. Arias–Santana*, 964 F.2d 1262, 1266 (1st Cir. 1992).

▇ Apart from this "heartland" of courtroom sequestration mandated by Rule 615, the court retains discretion to add other restrictions or not, as it judges appropriate. *Sepulveda*, 15 F.3d at 1176 ("Outside of the heartland, the district court may make whatever provisions it deems necessary to manage trials in the interests of justice."). The regulation of witness conduct outside the courtroom is thus left to the district judge's discretion. *Id.* The court may, for example, order that witnesses not converse with each other about the case. *See Arias–Santana*, 964 F.2d at 1266. Further, the court has the discretion to prohibit counsel from conferring with a witness during the witness's testimony, including during any recesses in the trial. *See Geders*, 425 U.S. at 87–88, 96 S.Ct. at 1334–35.

In this case the court granted Magana's oral motion for sequestration of witnesses without elaborating the terms of the order. It appears that the court assumed counsel's familiarity with a long-standing custom in the district that precluded counsel from conferring with a witness until the witness had been excused from the stand.[5] As it happened, the prosecutor had only recently relocated to the district and was not familiar with the local practice. Indeed, the judge noted that this was the prosecutor's first trial before him. Nevertheless, it was not unreasonable for the court to presume that an Assistant United States Attorney would be fa-

---

5. The district judge announced that he found the prosecutor's meeting with the witness to be "a clear violation of the practices of the court," and added, "I can't at the moment remember whether it's specified in the local rules or whether it's simply a custom that has been so long assumed that it's not present there." Tr. at 266. *See also*

Tr. at 262. In fact, the district's local rules do not address the matter. *See* Local Rules of the United States District Court for the District of Maine. To avoid the problem that arose in this case, a district court may find it advisable to promulgate, by local rule or otherwise, standard terms for witness sequestration orders.

miliar not only with the written rules of local practice, but also with those unwritten rules that had, by repeated application over time, become established as a "custom" of practice in the court. It is plain that the district court regarded the prohibition against conferring with a testifying witness as such an established custom, and we have no reason to question that assessment.

The district court concluded that the prosecutor's transgression had been inadvertent, "based on a misunderstanding of the rule." Tr. at 290. The defendants do not quarrel with that conclusion, and the record gives us no reason to doubt it. Because the violation was inadvertent, there was no need for any punitive sanction, and the focus of the court's response was properly on what needed to be done to prevent any prejudice to the defendants from the violation.

■■ As the district court has discretion in fashioning sequestration orders, it likewise has discretion in enforcing them. *Arias–Santana,* 964 F.2d at 1266 ("[T]he sanction determination is committed to the sound discretion of the trial court."). *See also United States v. Rossetti,* 768 F.2d 12, 16 (1st Cir. 1985); *United States v. Arruda,* 715 F.2d 671, 684 (1st Cir.1983). We review the district court's action only to see if there was an abuse of that discretion. *Arias–Santana,* 964 F.2d at 1265; *Rossetti,* 768 F.2d at 16. There was not.

■ We have recommended the course a district court should follow to deal with a situation in which evidence somehow improper is put before the jury: the court should strike the offending evidence and promptly instruct the jury to disregard it. *Sepulveda,* 15 F.3d at 1184. "[W]ithin wide margins, the potential for prejudice stemming from improper testimony ... can be satisfactorily dispelled by appropriate curative instructions." *Id.* Jurors are presumed to follow such instructions, except in extreme cases. *Id.* at 1185.

■ The district judge took exactly those steps. He responded promptly to the problem. "Swiftness in judicial response is an important element in alleviating prejudice once the jury has been exposed to improper testimony." *Id.* He permitted counsel to examine the witness about her conversation with the prosecutor and gave the defendants the choice to do that either in the presence of the jury or on *voir dire.* After the *voir dire,* he carefully evaluated the possibility of prejudice to the defendants before determining to strike the testimony, and even after making the tentative decision, he took steps to assure that counsel had considered fully what impact striking the testimony might have on the state of the evidence.

■ The circumstances did not call for more extreme action. "Declaring a mistrial is a last resort, only to be implemented if the taint is ineradicable, that is, only if the trial judge believes that the jury's exposure to the evidence is likely to prove beyond realistic hope of repair." *Id.* at 1184.

The significance of the evidence that was stricken was not great in the context of Cunningham's entire testimony. There had been extended cross-examination by both defendants the day before. The redirect itself was relatively brief, and the court found that it "did not significantly impair whatever value there was" in the previous cross-examination. Tr. at 266. Because of the relative brevity of the redirect, and because it was clearly separated from the balance of the witness's testimony by the overnight recess, the court concluded that the jury could realistically follow the instruction to put it out of their minds and to consider only the previous day's testimony by the witness. Accordingly, the court decided that striking the testimony and giving an appropriate instruction was a sufficient remedy. Our review of the record gives us no basis to say that that judgment was clearly wrong.[6]

■ Meda–Santos further contends that striking the testimony deprived her of the opportunity, which Magana briefly had, to conduct recross-examination of the witness. The court should have left the tainted testimony alone, she says, and let her take advantage of it on recross. To the extent that this

---

6. An abuse of discretion might be shown if the district court has made "a clear error of judg-

ment." *United States v. Hastings,* 847 F.2d 920, 924 (1st Cir.1988).

argument amounts to an assertion that the redirect examination was so potent that the jury could not realistically be expected to follow the instruction to disregard the testimony, we reject it for the reasons just stated. To the extent it is an objection that the defendant was deprived of a tactical weapon she might have had in the forensic battle, it is insubstantial. She had conducted a full cross-examination of the witness the day before, and in these circumstances any suggestion that the loss of an opportunity for re-cross amounted to a substantial infringement of her rights under the Confrontation Clause borders on the frivolous. *See United States v. Mulinelli–Navas,* 111 F.3d 983, 987 (1st Cir.1997).

Besides, the premise of the objection is infirm. Meda–Santos was not foreclosed from any further inquiry, as she claims. The court made clear that she could recall Cunningham to the stand as part of her case. She now says that it is unlikely that the court, having stricken the redirect, would have permitted her to question Cunningham about her meeting with the prosecutor, but the accuracy of that proposition is by no means clear. Meda–Santos never took up the opportunity opened to her to recall Cunningham, and how the district court would have responded to an attempt to inquire into the meeting with the prosecutor is a matter for speculation. We cannot find an abuse of discretion just because the appellant suggests that one of the district court's potential responses might have prejudiced her were it to have occurred.

■ Finally, Meda–Santos claims that the district court's handling of the violation of the sequestration order demonstrates why it was an error for the court to have denied her pretrial motion to sever her trial from Magana's. The pretrial motion to·sever was based on *Bruton*[7] grounds. Meda–Santos does not now contend that it was error to have denied the motion on those grounds. Rather, she asserts a more general conflict that became evident when, faced with inconsistent requests for action from the codefendants, the court necessarily had to choose one and reject the other. If Meda–Santos had been tried separately, that conflict would not have arisen, and she could have gotten the ruling she wanted, instead of having to live with the ruling Magana wanted.

Meda–Santos did not request severance when she and Magana sought different remedies for the violation of the sequestration order. Her failure to have made the argument to the trial court precludes her from raising it for the first time in this appeal. Accordingly, we review the point only for plain error, *United States v. Mitchell,* 85 F.3d 800, 807 (1st Cir.1996), and there was none.

■ There are obvious advantages in judicial economy to the joint trial of defendants accused of the joint commission of crimes. *See Zafiro v. United States,* 506 U.S. 534, 537, 113 S.Ct. 933, 936–37, 122 L.Ed.2d 317 (1993); *United States v. O'Bryant,* 998 F.2d 21, 25 (1st Cir.1993). *See also* Fed.R.Crim.P. 8. Like other important trial management decisions, the judgment whether to sever is largely left to the sound discretion of the trial court. *United States v. Flores–Rivera,* 56 F.3d 319, 325 (1st Cir.1995). The exercise of that discretion will be condemned only where it deprives a defendant of a fair trial, resulting in a miscarriage of justice. *United States v. McLaughlin,* 957 F.2d 12, 18 (1st Cir.1992); *Arruda,* 715 F.2d at 679. There was nothing approaching that degree of prejudice to Meda–Santos, if there was any recognizable prejudice at all, from denial of the severance motion.

Evidence is often admitted against one defendant but not another in a joint trial, with limiting instructions being given the jury. Sometimes evidence is conditionally admitted, subject to its being stricken if the subsequent predicate does not materialize as anticipated. It is not at all an uncommon event that the strategies of defense counsel or the nuances of the rules of evidence will lead codefendants to differ as to the admission of evidence in a joint trial. Each time that happens is not an occasion for severance. *See McLaughlin,* 957 F.2d at 18.

7. *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

All in all, the trial court's handling of the government's violation of the witness sequestration order was not only acceptable, but admirable. There was no abuse of discretion.

### B.

■ Prior to trial, the defendants sought discovery from the government to try to substantiate their claim that they were the victims of selective prosecution because of their ethnicity and/or national origin. In support of their motion, they pointed to press accounts of INS enforcement actions aimed at Spanish-speaking persons. The motion was denied on the ground that the defendants had not made a sufficient showing of the likelihood of selective prosecution to warrant the extraordinary discovery they were seeking. After their convictions, the defendants moved for a new trial, relying on the selective prosecution claim. In support of the latter motion, they added to their prior presentation the assertion that the trial itself had demonstrated that the government had chosen to prosecute only the Spanish-speaking defendants while choosing not to prosecute the other participants in the relevant events—Cunningham and Ferrante—who were not Spanish-speaking. The new trial motion was denied.

Because a selective prosecution claim "asks a court to exercise judicial power over a 'special province' of the Executive," *United States v. Armstrong*, — U.S. —, —, 116 S.Ct. 1480, 1486, 134 L.Ed.2d 687 (1996), courts have consistently demanded "clear evidence," *id.* (quoting *United States v. Chemical Found.*, 272 U.S. 1, 14–15, 47 S.Ct. 1, 6, 71 L.Ed. 131 (1926)), that a prosecutorial decision "had a discriminatory effect and that it was motivated by a discriminatory purpose." *Armstrong*, at —, 116 S.Ct. at 1487 (quoting *Wayte v. United States*, 470 U.S. 598, 608, 105 S.Ct. 1524, 1531, 84 L.Ed.2d 547 (1985)). The prosecutor is presumed to have acted "in good faith for reasons of sound governmental policy," *United States v. Saade*, 652 F.2d 1126, 1135 (1st Cir.1981), unless the defendant can demonstrate both that she has been singled out for prosecution when others similarly situated have not been prosecuted and that the prosecutor's reasons for doing so were impermissible. *United States v. Penagaricano–Soler*, 911 F.2d 833, 837–38 (1st Cir.1990).

Discovery concerning decisions to prosecute imposes substantial costs on the prosecutor. It intrudes on "the performance of a core executive constitutional function." *Armstrong*, at —, 116 S.Ct. at 1486. It may "divert prosecutors' resources and may disclose the Government's prosecutorial strategy." *Id.* at —, 116 S.Ct. at 1488. For these reasons, "[t]he justifications for a rigorous standard for the elements of a selective-prosecution claim thus require a correspondingly rigorous standard for discovery in aid of such a claim." *Id.*

The defendants did not make a sufficient prima facie showing of either discriminatory effect or discriminatory intent to justify the discovery they requested. Their pretrial motions relied only on a newspaper article about the arrest by the INS of four "illegal aliens" from El Salvador and Guatemala, the videotape of the INS interview of Magana and Cunningham (which displayed, according to the defendants, ethnic prejudice by the INS agent), and an unsworn statement that there were seventeen Spanish-speaking persons in INS custody in the local county jail. The district court properly determined that this showing fell short of what the cases require. At most, these facts, viewed favorably to the defendants, established that Spanish-speaking persons were being prosecuted by the INS. The materials contained no information about INS prosecutions, or the absence of them, of non-Spanish-speaking persons. The information presented thus addressed only one half of the critical proposition. In order to be permitted discovery in this area, the defendants were required to make a threshold showing that there were similarly situated persons who were not prosecuted. *Armstrong*, at —, 116 S.Ct. at 1489. Their proffer failed to do that.

When they renewed their attack on this front in their motions for a new trial, the defendants added to the pretrial proffer the assertion that their trial itself showed the different treatment of non-Spanish-speaking persons, because Cunningham and Ferrante,

both of whom participated in the same criminal events as the defendants, were not charged. That contention merits closer attention than the pretrial effort, but it nonetheless falls short of meeting the "rigorous standard" established by the cases. At most, the circumstance that Cunningham and Ferrante were not charged raises the question of selective prosecution; it does not make the prima facie showing required. *See Penagaricano–Soler*, 911 F.2d at 837.

There are many factors that affect a decision to prosecute a particular person, including "the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan." *Wayte*, 470 U.S. at 607, 105 S.Ct. at 1530. There are readily apparent nondiscriminatory reasons why Cunningham and Ferrante were not charged. When the sham marriage scheme was detected, Cunningham promptly confessed her role and agreed to cooperate with officials, and the consequence of her *cooperation was freedom from prosecution.* Her cooperation was a justifiable reason for the prosecutor's decision not to charge her. Ferrante had played a less central role in events. In fact, she had refused a leading role. The prosecutor might well have estimated that proving her criminal culpability was more problematic than it was for the others. She also apparently cooperated with the Government at the trial, and that again was a legitimate consideration for the prosecutor to take into account. Neither the denial of the pretrial motions for discovery nor the denial of the new trial motions constituted an abuse of its discretion by the trial court.

### III.

The claims of error brought to us by the defendants are without merit. The judgments of conviction, and the denial of the defendants' new trial motions, are *affirmed.*